No. 16-16048-C

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## UNITED STATES OF AMERICA,

### Appellee,

### v.

## KHALED ELBEBLAWY,

### Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, D. CT. NO. 1:15-CR-20820 (HON. BETH BLOOM)

_____

## ANSWERING BRIEF FOR THE UNITED STATES

_____

BENJAMIN G. GREENBERG
Acting United States Attorney
Southern District of Florida

NALINA SOMBUNTHAM
Assistant United States Attorney
Southern District of Florida

NICHOLAS E. SURMACZ
VASANTH R. SRIDHARAN
Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

KENNETH A. BLANCO
Acting Assistant Attorney General

TREVOR N. MCFADDEN
Deputy Assistant Attorney General

ALEXANDER P. ROBBINS
Attorney
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
TEL 202-514-3521/FAX 202-305-2121
Alexander.Robbins@usdoj.gov

*United States v. Elbeblawy*, No. 16-16048-C

C-1 of 2

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

As required by 11th Cir. R. 26.1-1, I certify that the following persons and entities may have an interest in the outcome of this case:

Blanco, Kenneth A., Acting Assistant Attorney General

Bloom, Hon. Beth, presiding District Judge

Delisma, Kansky, co-conspirator

Elbeblawy, Khaled, defendant

Escalona, Euelises, co-conspirator

Ferrer, Wifredo A., former United States Attorney

Gobena, Gejaa, government attorney

Greenberg, Benjamin G., Acting United States Attorney

Klugh, Richard C., defense counsel

Marty, Francisco, former defense counsel

Matters, Michael, former defense counsel

McAliley, Hon. Chris M., Magistrate Judge

McFadden, Trevor N., Deputy Assistant Attorney General

*United States v. Elbeblawy*, No. 16-16048-C
C-2 of 2

Robbins, Alexander P., government attorney

Smachetti, Emily M., government attorney

Sombuntham, Nalina, government attorney

Sridharan, Vasanth, government attorney

Surmacz, Nicholas, government attorney

Vilches, Cynthia, co-conspirator

Warren, Andrew, government attorney

Wax, Barry M., government attorney

Williams, Hon. Kathleen M., District Judge


s/  Alexander P. Robbins
ALEXANDER P. ROBBINS
Attorney
Criminal Division, Appellate Section
United States Department of Justice
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
TEL 202-514-3521/FAX 202-305-2121
Alexander.Robbins@usdoj.gov


DATED:     October 6, 2017

## STATEMENT REGARDING ORAL ARGUMENT

Given the size of the record and the factual complexity of this case, oral argument may aid this Court's decision-making process.

# TABLE OF CONTENTS

Statement of Jurisdiction ................................................................................. 1
Statement of the Issues .................................................................................... 2
Statement of the Case ...................................................................................... 3

I.    Course of Proceedings and Dispositions in the Court Below............................ 3
II.   Statement of Facts .................................................................................. 4

      A. The Medicare Fraud .......................................................................... 4
      B. Elbeblawy Flees the Country, Comes Back and Cooperates,
         and Then Changes His Mind ............................................................ 10
      C. Verdict and Sentence........................................................................ 14

III.  Standards of Review ............................................................................. 15

Summary of Argument ................................................................................... 16
Argument ..................................................................................................... 18

I.    Elbeblawy's Signed Confession Was Properly Admitted Into Evidence........... 18

      A.    An Evidentiary Stipulation in a Criminal Case Does Not
            Require a Personal, "Knowing and Intelligent" Waiver
            by the Defendant........................................................................ 19

      B.    The District Court Committed No Clear Error in Finding That
            Elbeblawy Knowingly and Voluntarily Waived His Right to
            Exclude His Written Confession.................................................... 27

      C.    Any Error in the Admission of the Elbeblawy's Written Confession
            Was Harmless ........................................................................... 31

II.   There Was No *Brady* Violation................................................................ 33

III.  There Was No Constructive Amendment of Count 2........................................ 37

IV.   The District Court Correctly Calculated Elbeblawy's Guidelines Range........... 42

V.    The District Court's Forfeiture Order Should Be Vacated and the Case
      Remanded for Entry of a Forfeiture Order Consistent with *Honeycutt* .............. 46

Conclusion.................................................................................................... 49
Certificate of Compliance................................................................................ 50
Certificate of Service ...................................................................................... 51

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*, 521 U.S. 203 (1997) ................................................................47

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) .................................................47

*Arlington Cen. Sch. Dist. v. Murphy*, 548 U.S. 291 (2006) ..................................22

*\*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 2, 16, 33

*Brown v. United States*, — Fed. App'x —, 2017 WL 3404979 (3d Cir. 2017) ...............48

*Colorado v. Connelly*, 479 U.S. 157 (1986) ..........................................................23

*Dennis v. United States*, 384 U.S. 855 (1966) ......................................................40

*Gallego v. United States*, 174 F.3d 1196 (11th Cir. 1999) ......................... 15, 30

*Giglio v. United States*, 405 U.S. 150 (1972) .......................................................34

*Haas v. Henckel*, 216 U.S. 462 (1910) ..................................................................40

*\*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ......................................40

*\*Honeycutt v. United States*, 137 S. Ct. 1626 (2017) ..............................17, 47, 48

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ......................................................... 20, 22

*Kyles v. Whitley*, 514 U.S. 419 (1995) ..................................................................34

*\*Libretti v. United States*, 516 U.S. 29 (1995) ............................................... 24, 47

*Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002) ....................................................37

*Moran v. Burbine*, 475 U.S. 412 (1986) ...............................................................20

*New York v. Hill*, 528 U.S. 110 (2000) .................................................................23

*Peugh v. United States*, 133 S. Ct. 2072 (2013) ...................................................42

*Skilling v. United States*, 561 U.S. 358 (2010) ...................................................................41

*\*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................................... 34, 42

*United States v. Agurs*, 427 U.S. 97 (1976) .........................................................35

*United States v. Aviles*, 518 F.3d 1228 (11th Cir. 2008) ....................................................42

*United States v. Campa*, 529 F.3d 980 (11th Cir. 2008)........................................................20

*United States v. Campbell*, 491 F.3d 1306 (11th Cir. 2007) .................................................45

*United States v. Clarke*, 562 F.3d 1158 (11th Cir. 2009) ............................................. 43, 44

*United States v. Cobb*, 842 F.3d 1213 (11th Cir. 2016).........................................................16

*\*United States v. Curbelo*, 726 F.3d 1260 (11th Cir. 2013) ...............................................47

*United States v. Escobedo*, 757 F.3d 229 (5th Cir. 2014) .............................................. 25, 27

*United States v. Farias*, 836 F.3d 1315 (11th Cir. 2016)......................................................16

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) ....................................................32

*United States v. Green*, 842 F.3d 1299 (11th Cir. 2016)........................................22, 27, 43

*United States v. Hernandez*, 803 F.3d 1341 (11th Cir. 2015) ..............................................47

*United States v. Hernandez*, 864 F.3d 1292 (11th Cir. 2017)...............................................37

*United States v. Jeri*, — F.3d —, 2017 WL 3866412 (11th Cir. Sept. 5, 2017)............41

*United States v. Jones*, 601 F.3d 1247 (11th Cir. 2010) .......................................................36

*United States v. Joshi*, 896 F.2d 1303 (11th Cir. 1990) .......................................................23

*United States v. Kontny*, 238 F.3d 815 (7th Cir. 2001) ........................................................43

*United States v. Madden*, 733 F.3d 1314 (11th Cir. 2013) ...................................15, 38, 41

*United States v. Mathurin*, 868 F.3d 921 (11th Cir. 2017) ..................................................15

*United States v. Mayfield*, 361 Fed. App'x 425 (3d Cir. 2010)..........................................23

*\*United States v. Mezzanatto*, 513 U.S. 196 (1995).........................................20, 21, 22, 27

*United States v. Miller*, 188 F.3d 1312 (11th Cir. 1999) ....................................................45

*United States v. Mitchell*, 633 F.3d 997 (10th Cir. 2011)...................................................20

*United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) .....................................................45

*United States v. Naranjo*, 634 F.3d 1198 (11th Cir. 2011).................................................15

*United States v. Ndiaye*, 434 F.3d 1270 (11th Cir. 2006)...................................................30

*\*United States v. Padron*, 527 F.3d 1156 (11th Cir. 2008)................................................46

*United States v. Paul*, 518 Fed. App'x 894 (11th Cir. 2013) .............................................45

*United States v. Pickel*, 863 F.3d 1240 (10th Cir. 2017) ....................................................48

*United States v. Pielago*, 135 F.3d 703 (11th Cir. 1998) ....................................................41

*United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979)......................................................40

*United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002)........................................30

*United States v. Salmona*, 810 F.3d 806 (11th Cir. 2016)............................................ 22, 26

*United States v. Sanders*, 341 F.3d 809 (8th Cir. 2003) .............................................. 23, 24

*United States v. Siegelman*, 786 F.3d 1322 (11th Cir. 2015)........................................ 30, 45

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) ......................................................15

*United States v. Stevens*, 455 Fed. App'x 343 (4th Cir. 2011)............................................23

*United States v. Stewart*, 700 F.2d 702 (11th Cir. 1983) ...................................................24

*United States v. Vallejo*, 297 F.3d 1154 (11th Cir. 2002) ..................................................15

*United States v. Wetherald*, 636 F.3d 1315 (11th Cir. 2011) .............................................42

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ...................................................................34

**Statutes and Rules**

18 U.S.C. § 371.............................................................................3, 38, 39, 40

18 U.S.C. § 853.......................................................................................47

18 U.S.C. § 982.......................................................................................48

18 U.S.C. § 1343 ......................................................................................3

18 U.S.C. § 1347 ......................................................................................3

18 U.S.C. § 1349 ......................................................................................3

18 U.S.C. § 3231 ......................................................................................1

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 2111 .....................................................................................32

42 U.S.C. § 1320a-7b.............................................................................3, 39

42 U.S.C. § 1395x ....................................................................................4

Fed. R. App. P. 4 .....................................................................................1

Fed. R. Crim. P. 11 ......................................................................18, 23, 24

Fed. R. Crim. P. 52 ..................................................................................32

Fed. R. Evid. 103 ....................................................................................32

Fed. R. Evid. 1101 ..................................................................................43

Fed. R. Evid. 410 .............................................................................*passim*

U.S.S.G. § 1B1.3 .....................................................................................45

U.S.S.G. § 2B1.1 ........................................................................... 43, 45

U.S.S.G. § 2T1.1, cmt. n.9 ...............................................................43

U.S.S.G. § 5A (sentencing table)......................................................12

U.S.S.G. § 6A1.3 .............................................................................43

U.S.S.G. App. C, amend. 749...........................................................42

**Other Authorities**

Eleventh Circuit Pattern Jury Instructions (Criminal Cases) O13.6 (2016) ...............39

Restatement (Second) Contracts § 132 ........................................................26

## STATEMENT OF JURISDICTION

Khaled Elbeblawy, defendant below, appeals from the final judgment entered against him in this criminal case. The district court (Beth Bloom, District Judge) had jurisdiction over his prosecution under 18 U.S.C. § 3231. The district court sentenced Elbeblawy on August 30, 2016, and entered its judgment on the docket on August 31, 2016. *See* Doc. 170 (judgment); Doc. 179 (sentencing transcript).[1] The written judgment incorporated an order of forfeiture that was entered on the same day. *See* Doc. 170 at 6; Doc. 171. Elbeblawy filed a timely notice of appeal on September 12, 2016. *See* Fed. R. App. P. 4(b)(1). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

---

[1] "Doc." refers to a document number in the district court's docket; "Br." refers to the defendant's opening brief; and "Gov't Exh." refers to a trial exhibit introduced by the government. "Tr." refers to a trial transcript. Transcripts are cited both by their docket number and by their transcript volume number (*e.g.*, "Doc. 142 (6Tr.) at 1") unless shorter citations are necessary for ease of reading.

## STATEMENT OF THE ISSUES

1.   Whether the district court clearly erred by believing Elbeblawy's lawyer — and disbelieving Elbeblawy — when it found that Elbeblawy knowingly and voluntarily waived his right under Fed. R. Evid. 410 to preclude the admission of a signed written statement that he had made during plea negotiations with the government; and whether, if so, any such error was harmless.

2.   Whether a government witness's initial denial that he and Elbeblawy discussed referring patients — which the witness rescinded after being confronted with a video of him and Elbeblawy discussing referring patients — was material under *Brady v. Maryland*, 373 U.S. 83 (1963).

3.   Whether the district court constructively amended Count 2 of the indictment by instructing the jury that defrauding the government by deceptively impairing its lawful functions includes cheating the government out of money or property; and whether, if so, the error would require reversal given that Elbeblawy's conviction on Count 2 rests on an undisputedly valid alternative ground specified in the jury's special-verdict form.

4.   Whether the district court made clearly erroneous factual findings when calculating Elbeblawy's range under the Sentencing Guidelines.

5.   Whether the district court's order of forfeiture should be vacated.

## STATEMENT OF THE CASE

The district court characterized this as a "massive" Medicare-fraud case. Doc. 179 at 136. Khaled Elbeblawy was the owner and manager of three Miami-area home healthcare agencies. For seven years, Elbeblawy bribed doctors for Medicare patient referrals, falsified patients' medical paperwork, and billed Medicare for millions in unnecessary medical services.

## I.    Course of Proceedings and Dispositions in the Court Below

A grand jury in the Southern District of Florida returned an indictment against Elbeblawy on December 22, 2015, charging him with two counts of conspiracy. *See* Doc. 59 (superseding indictment). Count 1 alleged a conspiracy under 18 U.S.C. § 1349 to commit both healthcare fraud (in violation of 18 U.S.C. § 1347) and wire fraud (in violation of 18 U.S.C. § 1343). *See* Doc. 59 at 7-8. Count 2 alleged a conspiracy under 18 U.S.C. § 371 both to pay kickbacks for referring Medicare patients (in violation of 42 U.S.C. § 1320a-7b(b)(2)(A)) and to defraud the United States (in violation of § 371's "defraud clause"). *See* Doc. 59 at 9-10.

Following a six-day trial at which Elbeblawy testified in his own defense, the jury found Elbeblawy guilty on both conspiracy counts. The jury returned a special verdict unanimously finding him guilty of each of the two alleged objects in each of the two counts. *See* Doc. 90. He was sentenced to 20 years in prison and ordered to pay $36 million in restitution and forfeiture. Doc. 170.

Elbeblawy appeals his convictions, his sentence of imprisonment, and the order of forfeiture.  He is incarcerated.

## II.    Statement of Facts

Elbeblawy defrauded Medicare of tens of millions of dollars over the course of seven years by paying doctors for referring patients and then billing for unnecessary or nonexistent services.  After being caught, Elbeblawy confessed, and he spent the next two years cooperating with the government's investigation of the doctors involved in his scheme.  But before pleading guilty, Elbeblawy changed his mind; he exercised his right to go to trial, and he was convicted.

### A. The Medicare Fraud

In 2004, Khaled Elbeblawy started working at "Willsand Home Health," a home health agency in the Miami area.  Doc. 138 (2Tr.) at 18-20.  A "home health agency" is a company that provides in-home medical nursing and physical-therapy services for homebound patients.  *Id.* at 18-19; *see also* 42 U.S.C. § 1395x(*o*).  Elbeblawy came aboard as Willsand's billing agent.  Doc. 138 (2Tr.) at 19-20; *see also id.* at 178.  At the time, Willsand was already engaged in fraud: according the owner of Willsand, Eulises Escalona,[2] the company was "falsifying [patients'] medical records, overexaggerating

---

[2] Escalona's first name is misspelled as "Uelises" in the transcript.  *See* Doc. 138 (2Tr.) at 10; *compare, e.g., United States v. Eulises Escalona*, 1:12-cr-20293 (S.D. Fla.); Gov't Exh. 105 at 27.

symptoms for those patients in order to get paid from Medicare," and "bill[ing] for services that weren't even provided." *Id.* at 19; *see also id.* at 22.

Elbeblawy quickly got up to speed in carrying out the existing fraud, but he also discussed with Escalona how to get even "more money from Medicare." *Id.* at 22-23. A year into his new job, in 2005, Elbeblawy asked Escalona for a promotion and offered an idea for generating additional (fraudulent) business: Elbeblawy wanted to be "the marketing director of the company," and he offered "to go out there . . . and recruit doctors for patients [in exchange] for kickbacks." *Id.* at 24; *see also id.* ("[H]e sa[id] if we pay kickback[s], and we take also those doctors to lunch or give them [a] nice gift, that will be attractive for them to refer us patients."). Escalona said yes, and Elbeblawy's kickback scheme was successful: Willsand "start[ed] billing more," and its number of patients "increased very drastically." *Id.* at 19, 77.

Elbeblawy and Escalona agreed to pay doctors between $400 and $800 per patient, depending on "how much money" they could "bill and receive for those patients." Doc. 138 (2Tr.) at 28. They also agreed to keep their kickback scheme a secret and to use only cash, "because cash was the only way we [would] no[t] get a paper trail" for the payments. *Id.* at 26. Escalona explained how Elbeblawy was able to bring so many new doctors into the scheme:

> [I]f you walk to somebody's office, or doctor's office, and you are empty-handed, it will be difficult for that doctor to do some business with you. But if you go there and you have at least a nice pen, and you give them a nice pen, that will open the door for you to start doing business with them.

*Id.* at 30; *see also id.* at 31-32 (noting that these "nice pen[s]" were $395 Montblancs).

Once Elbeblawy had "established the relationship with . . . the doctors," he would meet with each doctor and have the doctor sign medical forms authorizing in-home healthcare services for a whole "list" of that doctor's patients. *Id.* at 37-39. Escalona would sometimes go with Elbeblawy, and he testified that each set of medical forms had post-it notes indicating where the doctor should sign, and that the doctors signed the forms without reading them. *See id.* at 37-38 ("There were too many. They didn't have time to read all those documents."). In exchange for the signed forms, each doctor would receive an envelope filled with cash. *Id.* at 39. Afterwards Elbeblawy (and sometimes Escalona) would take the patient list for the doctor they had just paid and would "break it in piece[s] and most of the time flush it [down] a toilet, or if there wasn't a toilet available maybe drop the piece[s] in different garbage can[s]." *Id.* at 39-40; *see also id.* at 100 (referring to this ripping-up-and-flushing procedure as "our protocol").

The medical services that these doctors were authorizing with their signatures "weren't actually needed" (*id.* at 38), or if they were it was by accident — Elbeblawy would simply pick whatever medical services were the most remunerative. Early on, it was in-home nursing for diabetics that yielded the most money: "between $8,000 and $14,000" for a 60-day period of "treatment." *Id.* at 77-78. At some point the "reimbursement [rate] for diabetic care . . . drop[ped]," so Elbeblawy shifted accordingly — "physical therapy," Elbeblawy told one doctor later on in the scheme,

was "where the money is." Doc. 139 (3Tr.) at 153-154. Elbeblawy's goal was "to maximize his reimbursement," and whether a patient actually needed the medical care was irrelevant. *Id.*; *see also* Doc. 138 (2Tr.) at 78-80. Escalona testified that "the majority" of Willsand's "patients didn't actually need the services" for which Willsand was billing Medicare (*id.* at 78), and he estimated that Willsand received about 90% of its patients "through kickbacks." *Id.* at 106-107; *see also, e.g.*, Doc. 139 (3Tr.) at 147-165 (testimony from one of the doctors, who would meet Elbeblawy about twice a month in a hospital parking lot, receive an envelope of cash, and sign medical-treatment forms without reading them).

The kickbacks were not limited to medical doctors. Under Elbeblawy's direction, Willsand also purchased patients from nurses, from "patient recruiters," and from subcontracting home-health entities that were not themselves authorized to bill Medicare (referred to as "staffing groups" or simply "groups"). Doc. 138 (2Tr.) at 33-34, 42-43, 60-61. Because these staffing groups were large entities, not individuals, it was impractical to pay them in cash; Elbeblawy and Escalona actually hired a lawyer to find out whether there was a legal way to pay the groups for referring patients. *Id.* at 44-45. The lawyer told them no (*id.* at 58), however, so instead they decided to disguise their check payments to the staffing groups by inflating the rate they paid to those groups for staffing services. *See id.* at 54 (offering an example where Willsand paid $43 per visit for a nurse when the normal rate was $25, because the staffing agency providing the nurse also referred the patient being visited — an $18 difference that would translate

- 7 -

to a kickback payment of about $1,000 for a 60-day series of daily nurse visits). On behalf of Willsand, Elbeblawy also hired "[b]etween eight and ten" patient recruiters and paid them for each referral by check. *Id.* at 61. To conceal Willsand's kickbacks to these recruiters, Elbeblawy disguised the payments as legitimate expenses for consulting and other services. *Id.* at 63; *see also, e.g.*, *id.* at 65 ("Q. And why did you call them 'patient care coordinators' and not 'recruiters'? / A. Well, if you use the word 'recruiter' out there, you will be caught very easy.").

By the end of his time at Willsand, Elbeblawy was holding himself out as the company's CEO. *See* Doc. 137 (1Tr.) at 260 (discussing Gov't Exh. 415). But Willsand still belonged to Escalona. Elbeblawy told Escalona that he wanted to become a partner in Willsand, dividing the profits equally, but Escalona refused. *See* Doc. 138 (2Tr.) at 82-84. Instead, Escalona agreed to become equal partners in a new firm, and in 2007 the two launched "JEM Home Health" (pronounced "Jem"). JEM had "the same modus operand[i]" as Willsand, and it used most of the same sources of patient referrals. *Id.* at 87, 93. JEM also received about 90% of its patients in exchange for kickbacks. *Id.* at 106-107. And at JEM, as at Willsand, Elbeblawy was the person "in charge" of paying the kickbacks and "falsify[ing] [the] patient files." *Id.* at 87-88.

JEM operated this way from 2007 until early 2009, when Elbeblawy decided to push Escalona out of the company. Elbeblawy removed Escalona's signature authority over JEM's bank account, deleted Escalona's name from the corporation's state records, and changed the locks on the company's offices. *Id.* at 108-110. Escalona tried

- 8 -

to continue running Willsand on his own — Willsand and JEM had been operating simultaneously since 2007 — but the "doctors, recruiters, and groups" that had been referring patients in exchange for kickbacks followed Elbeblawy to JEM. *Id.* at 111.

In November 2009, however, the Medicare program finally caught on to Elbeblawy's fraud and suspended its payments to JEM. *See* Doc. 139 (3Tr.) at 22-23; *see also* Gov't Exh. 110. An investigation had uncovered numerous examples of JEM's supposedly homebound patients walking to and from strip malls and telling investigators that their "home health" aides did not actually "perform personal care." 3Tr. 24-26. And audits of JEM's claims revealed huge overpayment rates for two different time periods: 73% of JEM's claims between July 2008 and July 2009 should never have been paid, and that figure was almost 99% (98.71%) for the period between August 2009 and February 2010. *See* Gov't Exh. 111; Doc. 139 (3Tr.) at 27-31.

By the time Medicare caught on, Willsand and JEM had received $29.1 million and $8.7 million, respectively, in Medicare payments. *See* Doc. 140 (4Tr.) at 63, 65 (discussing Gov't Exhs. 1000 & 1001). But Elbeblawy was not finished. Although Medicare rules prohibit an individual affiliated with a suspended agency from moving on to another agency, Elbeblawy used his wife to open a new home health agency, "Healthy Choice," and put the business in her name. Doc. 139 (3Tr.) at 38-40; Doc. 140 (4Tr.) at 66; Gov't Exh. 106; *see also* Doc. 142 (6Tr.) at 41-42 (Elbeblawy's testimony

admitting that he and his (now-ex-)wife worked together at Healthy Choice).[3]  This allowed Elbeblawy's scheme to go on for another few years, bilking the government out of an additional $2.5 million.  Doc. 140 (4Tr.) at 67; Gov't Exh. 1002.

## B. Elbeblawy Flees the Country, Comes Back and Cooperates, and Then Changes His Mind

Escalona was arrested by federal agents in May 2012, and a week and a half later Elbeblawy left the United States and flew to his hometown of Cairo, Egypt.  Doc. 140 (2Tr.) at 210; Gov't Exh. 1008.  In his testimony, Elbeblawy admitted that "when Mr. Escalona g[o]t arrested, the first thing [that] came to my mind . . . [was that] my name not . . be right next to his name," and so "to avoid that . . . I hired a lawyer" in case "the Government want[ed] to contact me."  Doc. 142 (6Tr.) at 45.  Elbeblawy claimed that he left the country, however, not for fear of being arrested but "because [of] something related to my divorce."  *Id.* at 35.  Elbeblawy remained out of the country for more than six months, and during this time he wired himself $20,000 from his U.S. accounts to a bank account in Egypt.  2Tr. 210; Gov't Exh. 1009.  He came back to the United States in November 2012.  2Tr. 210.  At some point after coming back he seized Healthy

---

[3] Elbeblawy and his then-wife entered into a "stock purchase option agreement" that would allow Elbeblawy to buy Healthy Choice from her for ten dollars with prior written notice, which he did in 2013 when they were going through their divorce.  *See* Doc. 140 (4Tr.) at 198-199.  Elbeblawy claimed in his testimony that this ten-dollar purchase option was his wife's idea.  *See* Doc. 142 (6Tr.) at 39.

Choice's computers from his wife, although he claimed he did this because he was in divorce proceedings with his wife rather than out of any intent to obstruct the criminal investigation. *See* Doc. 142 (6Tr.) at 227-228; Gov't Exh. 600 (text-message exchange with his wife).

In early 2013, "[s]oon after" Elbeblawy's ex-wife was interviewed by federal agents, the government received a telephone call from Elbeblawy's lawyer "saying that he wanted to meet." Doc. 137 (1Tr.) at 205. Elbeblawy first met with the government on March 11, 2013, with his lawyer present. He told the prosecutor and investigating agents, "Human[s] make mistakes," and he admitted that "he knew what he did was wrong." Doc. 140 (4Tr.) at 116; *see also* Doc. 137 (1Tr.) at 206. Elbeblawy came back in a week later with a handwritten list that he had made of the doctors, home-health groups, and recruiters involved in his scheme (Gov't Exh. 6). *See* 4Tr. 125. During this second (March 18) meeting, federal agents gave Elbeblawy a separate, printed list of physicians who had referred patients to JEM; the agents asked Elbeblawy to place a mark next to the names of physicians he had paid kickbacks to, and he did. *See* Gov't Exh. 7 (the list as marked by Elbeblawy); *see also* Doc. 139 (3Tr.) at 74 (testimony of HHS special agent); 4Tr. 127 (testimony of FBI special agent).

Using these lists as a starting point, Elbeblawy began to meet with the physicians and "do recordings on them." 3Tr. 75. Elbeblawy would offer the physicians "the same number we used to do." *See, e.g.*, 3Tr. 95; *id.* at 170 ("I remember what I used to do with you before. Let me know what you have in mind. . . . Any number you tell me

for a patient."). Elbeblawy cooperated like this for over two years, making more than 30 recordings. 1Tr. 206-207.

In June 2015, it came time for Elbeblawy to plead guilty. *Id.* at 208-209. Elbeblawy signed an agreement with the government (Doc. 28-1) in which he agreed to plead guilty in exchange for the government's recommendation of a within-Guidelines sentence and a three-level reduction in his offense level for acceptance of responsibility. Fourteen days later, Elbeblawy signed a written confession providing a factual basis for his planned guilty plea. *Id.*; *see also* Gov't Exh. 1 (Agreed Factual Basis for Guilty Plea). But then, before pleading guilty, Elbeblawy "changed [his] mind." Doc. 142 (6Tr.) at 177. Elbeblawy explained his decision in his testimony at trial: "They want[ed] me to sign [away] eleven years of my life. . . . All of a sudden, just the mechanism of your life changes completely. You're going to jail, after two years of trying to . . . do[] the right thing." Doc. 142 (6Tr.) at 90-91.[4] Although Elbeblawy testified that his lawyer urged him not to "lose the work you did for them for two and a half years," he also testified that he disliked the way his lawyer seemed as though "he was always trying to please" the prosecutors. 6Tr. 89; *see also id.* at 60-61 ("[I]t was a

_____

[4] Elbeblawy was correct about his 11-year exposure under the Guidelines, had he been in criminal history category I. *See* Doc. 28-1 at 9 (providing for a total offense level of 31 under the Sentencing Guidelines); USSG § 5A (sentencing table) (yielding a maximum advisory sentence of 135 months, or 11 years and three months). Elbeblawy also mentioned "108 months" in his testimony, 6Tr. 90, which corresponded to the bottom of the same Guidelines range.

friendly way between them. . . .  I did not like it."). So Elbeblawy got a new lawyer (Doc. 6) and went to trial.

At trial, the government introduced all of the evidence derived from Elbeblawy's two years of cooperation, including the videos of Elbeblawy discussing his prior kickback arrangements with various doctors (*see* Doc. 139 (3Tr.) at 75-96, 166-173) and Elbeblawy's inculpatory statements to federal agents (*see, e.g.*, 1Tr. 206-207; 3Tr. 74-75; 4Tr. 116-130; Gov't Exhs. 6 & 7).  The government also introduced Elbeblawy's signed confession.  *See* Doc. 177 at 89-94 (oral ruling that the signed confession was admissible).  Additionally, the government introduced extensive testimony from Elbeblawy's main co-conspirator, Escalona (*see* Doc. 138 (2Tr.) at 10-234), and from one of the doctors, Kansky Delisma, who was caught on video talking to Elbeblawy about their past kickback arrangement (*see* Doc. 139 (3Tr.) at 138-237).

Elbeblawy's defense — after he fired his (new) lawyer in the middle of trial and decided to represent himself — was to claim that he "was completely framed." Doc. 142 (6Tr.) at 197.  Elbeblawy admitted that the doctors on the videos were talking about accepting kickbacks from him, but he told the jury he found the whole thing "kind of surprising" (*id.* at 71):

> I never thought that they received kickbacks.  And to be honest — and this is the first time I say this.  Even the Government doesn't know, or I never said this to them.  When they accepted the kickbacks, it was kind of surprising for me.  They accept it from me.

- 13 -

As for marking the names of doctors he had previously paid kickbacks to (Gov't Exh. 7), Elbeblawy admitted that he "put the X's on this document," but testified that he did so only "[b]ecause [the government] told me to[,] [n]ot willingly." Doc. 142 (6Tr.) at 201; *see also id.* ("You told me to do so. I'm going to answer it that way, and I will not change my answer. Your agents told me to do so. That's exactly what happened.").

### C. Verdict and Sentence

The jury convicted Elbeblawy, unanimously finding him guilty on a special-verdict form (Doc. 90) of each object on both conspiracy counts. The district court imposed a forfeiture order of $36,400,957, representing 90% of the total value of the payments Medicare made to Willsand, JEM, and Healthy Choice. Doc. 179 at 58 (transcript of forfeiture and sentencing hearing); *see also* Gov't Exhs. 1000, 1001, 1002; *see also* Doc. 138 (2Tr.) 106-107 (Escalona's testimony providing the 90% estimate). The court used the same figure to calculate the loss amount under the Sentencing Guidelines, and imposed enhancements for Elbeblawy's managing and organizing extensive criminal activity, for his sophisticated means (because Elbeblawy created sham contracts to disguise his check kickback payments to staffing groups and patient recruiters), and for his obstruction of justice (because Elbeblawy threatened to kill Escalona the day before Escalona's testimony and told fellow inmates that Escalona was a "snitch"). *See* Doc. 179 at 97-99; *see also* Doc. 138 (2Tr.) at 7-8 (threat to Escalona); *id.* at 54, 63 (disguised payments). The district court calculated a total offense

level of 41 under the Sentencing Guidelines, which with Elbeblawy's criminal history level II (for battering his wife while on probation) yielded an advisory sentencing range of 360 months to life in prison.  Doc. 179 at 100; *see also id.* at 86, 99 (*nolo* plea to battery); Doc. 135 (PSR) ¶ 74-75.  The district court imposed a below-Guidelines sentence of 240 months.  *Id.* at 137.

## III.    Standards of Review

1.  "In reviewing the district court's suppression rulings," this court "review[s] factual findings for clear error and the court's application of law to those facts *de novo,*" construing the facts "in the light most favorable to the prevailing party."  *United States v. Mathurin*, 868 F.3d 921, 927 (11th Cir. 2017).  Whether to credit a defendant's version of events or his former lawyer's version of events is a question of fact.  *See Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999).

2.  This Court has held that "a district court's denial of a motion for new trial based on a *Brady* violation is reviewed for abuse of discretion."  *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002); *United States v. Naranjo*, 634 F.3d 1198, 1206 (11th Cir. 2011); *see also* Br. 18 (endorsing this standard).  *But see, e.g.*, *United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017) ("We review *de novo* alleged *Brady* or *Giglio* violations.").

3.  A forfeited constructive-amendment claim is reviewed for plain error.  *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).

4.  A district court's interpretation of the Sentencing Guidelines is reviewed *de novo* and its factual findings at sentencing are reviewed for clear error. *United States v. Cobb*, 842 F.3d 1213, 1218 (11th Cir. 2016).

5.  A district court's "legal conclusions regarding forfeiture" are likewise reviewed *de novo*, with the court's "factual findings [reviewed] only for clear error." *United States v. Farias*, 836 F.3d 1315, 1323 (11th Cir. 2016).

## SUMMARY OF ARGUMENT

1.  Elbeblawy and his pretrial counsel both signed the plea agreement stipulating that Elbeblawy's written confession would be admissible under Rule 410 if Elbeblawy went to trial. A lawyer is allowed to stipulate to the admission of evidence. And even if a personal, knowing-and-voluntary waiver were required, the district court found that Elbeblawy's waiver met that standard, expressly disbelieving Elbeblawy's testimony to the contrary. In any event, given the overwhelming evidence in this case — including Elbeblawy's own incriminating statements not covered by Rule 410 (like his videotaped discussions with doctors about paying kickbacks) — any error in admitting the written confession would have been harmless.

2.  There was no *Brady* violation, because Delisma's initial denial that he had not seen Elbeblawy in the past four or five years and had never talked to him about referring patients was easily disproven by the videorecording of their meeting a year earlier. Nor would this statement be significant new impeachment material, since Delisma was a relatively minor witness who was already impeached for lying to federal agents.

3. There was no constructive amendment to Count 2 of the indictment. Cheating the government out of money or property is a type of deceptive interference with its lawful functions, and so the district court's reference to money or property in its jury instructions — which Elbeblawy did not object to at the time — was neither error nor plain error. In any event, the special-verdict form makes clear that the jury's guilty verdict also rests on an alternative valid ground.

4. The district court committed no clear error in finding that Elbeblawy's criminal conduct continued after November 2011, that Elbeblawy used sophisticated means when disguising his kickback payments, or that the total fraud loss was greater than $25 million.

5. The district court correctly followed this Court's precedents rejecting Elbeblawy's arguments that there is no statutory authority for *in personam* forfeiture and that the Sixth Amendment requires forfeiture to be determined by a jury. In light of the Supreme Court's intervening decision in *Honeycutt*, however, the district court erred in holding Elbeblawy liable for fraud proceeds that Elbeblawy had no ownership interest in and did not personally benefit from.

- 17 -

## ARGUMENT

## I.     Elbeblawy's Signed Confession Was Properly Admitted Into Evidence

Elbeblawy's primary claim on appeal (Br. 23-36) is that the government violated Rule 410 of the Federal Rules of Evidence[5] by introducing at trial the "written confession" Elbeblawy had signed as part of his plea agreement.  *See* Gov't Exh. 1, Doc. 28-1 ("Agreed Factual Basis for Guilty Plea," submitted as an attachment to the plea agreement); *see also* Doc. 137 (1Tr.) at 208-210 (admitting this "Factual Basis" into evidence).[6]

Elbeblawy acknowledges that he waived his right under Rule 410 to exclude the Factual Basis.  *See* Doc. 28-1 at 13 (plea agreement).  And he acknowledges that he personally signed both the plea agreement and the Factual Basis.  Br. 14.  But Elbeblawy claims that he did not waive Rule 410 "knowingly and voluntarily."  Br. 24.  And although Elbeblawy acknowledges that the district court found otherwise —

---

[5] Rule 410 provides that evidence of "a statement made during plea discussions with an attorney for the prosecuting authority" is generally inadmissible "if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea."  Fed. R. Evid. 410(a)(4).  Rule 11(f) of the Federal Rules of Criminal Procedure also address the admissibility of statements related to plea discussions, but provides simply that "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."

[6] Elbeblawy also challenges the admission of "testimony about the related plea agreement."  Br. 23.  The plea agreement itself, however, was never admitted into evidence.  And except for a single instance in which defense counsel attempted to have a witness read parts of it (1Tr. 243-244; *see also id.* at 266), the plea agreement was discussed in the trial testimony only in connection with Elbeblawy's written confession.

disbelieving Elbeblawy's testimony after a two-day evidentiary hearing and "finding that Elbeblawy waived the protections of Rule 410 knowingly and voluntarily," *see* Doc. 177 at 91, 93 (oral decision) — Elbeblawy challenges the district court's finding as clearly erroneous.

His challenge fails for three reasons. *First*, Elbeblawy applies the wrong legal standard, conflating a stipulation to the admission of evidence with the waiver of a fundamental constitutional right such as the right to counsel. *Second*, even under Elbeblawy's incorrect standard, he cannot show that the district court clearly erred in finding that he knowingly and voluntarily waived the application of Rule 410 and in finding that his testimony to the contrary lacked credibility. *Third*, even if the district court did clearly err, the error would be harmless in light of the overwhelming evidence against him, including his own statements and confessions made outside of the context of plea negotiations and not covered by Rule 410.

## A. An Evidentiary Stipulation in a Criminal Case Does Not Require a Personal, "Knowing and Intelligent" Waiver by the Defendant

The legal premise of Elbeblawy's challenge to the admissibility of his written confession appears to be that waiving the protections of an evidentiary rule like Rule 410 is subject to the same "knowing and intelligent" standard as the waiver of a fundamental constitutional right like the right to counsel. *See* Br. 26 (citing *Johnson v.*

- 19 -

*Zerbst*, 304 U.S. 458, 464 (1938) (right to counsel), and *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (*Miranda* rights)).  That premise is incorrect.[7]

The controlling case is *United States v. Mezzanatto*, 513 U.S. 196 (1995), which makes clear that Rule 410 is as waivable as any other evidentiary rule.  In *Mezzanatto*, the Supreme Court upheld a waiver similar to the one in this case: where, as part of a plea agreement, a defendant agreed to allow the introduction of plea-related statements in any future trial.[8]  *Mezzanatto* explained that, "in the context of a broad array of constitutional and statutory provisions," the Supreme Court has "adhered to the . . . presumption that" waiver is available "absent some sort of express" provision to the contrary.  *Id.* at 200-201.  And "in the context of evidentiary rules," in particular, "[c]ourts have liberally enforced agreements to waive various exclusionary rules."  *Id.* at

---

[7] The government did not directly challenge Elbeblawy's legal premise below, although it did argue that Elbeblawy bore the burden of establishing that his waiver was invalid.  Doc. 33 at 7-8.  This Court, however, may "affirm the decision of the district court on any ground that finds support in the record."  *United States v. Campa*, 529 F.3d 980, 998 (11th Cir. 2008).

[8] A concurrence in *Mezzanatto* stated that the Court's holding was limited to the use of plea-related statements as impeachment evidence, *see* 513 U.S. at 211 (Ginsburg, J., joined by O'Conner and Breyer, JJ.), although the dissent argued that the majority's reasoning necessarily applied to cases like this one, where the statements were also introduced as substantive evidence of guilt: "[t]he Rules draw no distinction between use of a statement for impeachment and use in the Government's case in chief," *id.* at 217 (Souter, J., joined by Stevens, J.).  Every court of appeals to address the issue has concluded that *Mezzanatto* applies equally to the introduction of plea statements as impeachment evidence and as substantive evidence of guilt.  *See United States v. Mitchell*, 633 F.3d 997, 1004 (10th Cir. 2011) (citing cases).  Elbeblawy offers no argument that *Mezzanatto* should not apply to this case.  *See* Br. 25 (citing *Mezzanatto*).

- 20 -

202 (internal quotations marks omitted); *see also id.* (offering the examples of authenticity and hearsay, collecting cases). Such "evidentiary stipulations," as the Court noted, "are a valuable and integral part of everyday trial practice." *Id.* at 203. Moreover, allowing "interested parties to enter into knowing and voluntary negotiations without any arbitrary limits on their bargaining chips" is consistent with "public policy" goals, such as judicial efficiency and voluntary settlement. *Id.* at 208.

The Court acknowledged in *Mezzanatto* that there are some basic "guarantee[s] [of] fair procedure that cannot be waived" without "discrediting the federal courts" — noting, as examples, that a "court may decline a defendant's waiver of his right to conflict-free counsel," and that, "if the parties stipulated to trial by 12 orangutans[,] the defendant's conviction would be invalid notwithstanding his consent." *Id.* at 204. But the Court concluded that an agreement to waive the application of Rule 410 "plainly will not have that effect." *Id.* To the contrary, a "contract . . . admitting evidence that would otherwise have been barred by an exclusionary rule. . . . aids in the final determination of the true situation." *Id.* at 204-05 (internal quotation marks omitted). Thus, concluded the Court, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Id.* at 210.

There is no requirement under *Mezzanatto* that a defendant *personally* waive these exclusionary provisions — any more than a (represented) defendant must personally enter into evidentiary stipulations regarding hearsay and authenticity. *See* 513 U.S. at

- 21 -

202.    *Mezzanatto*'s "unknowingly or involuntarily" caveat did not, contrary to Elbeblawy's implied argument to this Court (and his express argument below, *see* Doc. 179 at 33), hold *sub silentio* that a Rule 410 waiver must satisfy the same stringent conditions as waiver of a personal, fundamental right like the right to counsel.  *See* Br. 25-26 (citing *Johnson v. Zerbst*, 304 U.S. 458).  And *Mezzanatto* elsewhere referred to "knowing and voluntary negotiations" between *represented parties*, suggesting that the caveat to its holding — that a Rule 410 waiver is valid and enforceable "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily," 513 U.S. at 210 — was an application of the "general principles of contract law" governing plea agreements.  *See United States v. Salmona*, 810 F.3d 806, 812 (11th Cir. 2016); *see also, e.g.*, *Arlington Cen. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (analogizing federal-funding conditions to contract law and asking whether the *representative* of a party — "a state official" — could "voluntarily and knowingly" accept the conditions).  Indeed, this Court has held that "defense counsel" could validly "waive[] any claim" under Rule 410 to the introduction of a prior plea.  *See United States v. Green*, 842 F.3d 1299, 1315 n.10 (11th Cir. 2016) (citing *Mezzanatto*).  And the Eighth Circuit has likewise held that a defendant seeking to invalidate a Rule 410 waiver "must show more than that he misunderstood the extent of his waiver or its ramifications; he

- 22 -

must show his will was overborne." *United States v. Sanders*, 341 F.3d 809, 817 (8th Cir. 2003).[9]

It would be anomalous to require a personal, "knowing and intelligent" waiver for a rule of evidence. When a party is represented, "decisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." *New York v. Hill*, 528 U.S. 110, 115 (2000) (internal citations omitted). Accordingly, this Court "has permitted defense counsel to make tactical decisions that have the effect of waiving" even their clients' "constitutional rights," such as the right to trial before an unbiased jury. *United States v. Joshi*, 896 F.2d 1303, 1308 (11th Cir. 1990) (collecting other examples, including waiving an element of the offense, waiving a defect in the jury, and deciding not to cross-examine a witness). And while a defendant's *plea* must be made personally and in open court, *see* Fed. R. Crim. P. 11(b) (listing specific rights that a court must determine a defendant understands after addressing the defendant "personally in open court"), a "plea of guilty" and a "provision contained in a plea agreement are different matters altogether." *Libretti v. United States*, 516 U.S. 29, 42

---

[9] *See also United States v. Stevens*, 455 Fed. App'x 343, 345-46 (4th Cir. 2011). *But see United States v. Mayfield*, 361 Fed. App'x 425, 431 (3d Cir. 2010) (applying the standard for custodial *Miranda* waivers to Rule 410 waivers, citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). Elbeblawy relies on neither of these unpublished decisions in his brief, nor does he address the Eighth Circuit's published decision in *Sanders*.

(1995) (no Rule 11 inquiry necessary regarding a forfeiture provision in a plea agreement). Asking a defendant to personally agree to every provision in a plea agreement — including the waiver of any rights other than those specifically enumerated in Fed. R. Crim. P. 11(b)(1)(A)-(O) — might be sound practice, and it was the one that the government followed in this case (*see* Doc. 28-1 at 14). But it was not required. "Only where there is evidence of fraud or gross incompetence by an attorney — which is not an issue here — or where an inherently personal right of fundamental importance is involved, does the law require defendant to personally waive his or her rights." *United States v. Stewart*, 700 F.2d 702, 704 (11th Cir. 1983) (citations and internal quotation marks omitted).

Applying the correct legal standard, Elbeblawy's argument necessarily fails. Both Elbeblawy and his lawyer signed the plea agreement, and Elbeblawy fails to show "that will was overborne," *Sanders*, 341 F.3d at 817, or that neither he nor his lawyer could have understood the relevant waiver provision. The agreement was clear about what would happen if Elbeblawy went to trial: "The Defendant waives any protections afforded by . . . Rule 410 of the Federal Rules of Evidence, and the Government will be free to use against the Defendant . . . any of the information, statements, and materials provided by him pursuant to this Agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea." Doc. 28-1 at 13.

Elbeblawy claims the condition precedent to this provision was ambiguous, relying on (Br. 25) a Fifth Circuit case, *United States v. Escobedo*, 757 F.3d 229 (5th Cir.

- 24 -

2014). *Escobedo* held that the government could not use Rule 410 statements against a defendant where it was unclear whether the defendant had breached the agreement by withdrawing his guilty plea prior to its acceptance by the court. *See id.* at 233-34 (noting that the defendant "had an absolute right under Federal Rule of Criminal Procedure 11(d)(1) to withdraw his guilty plea before it was accepted by the district court," and that nothing in the agreement defined such a withdrawal as a breach of the agreement). But Elbeblawy's plea agreement had no such defect: it specifically defined "breach" to include an "attempt[] to withdraw the plea (prior to or after pleading guilty to the charges identified in paragraph one (1) above)." Doc. 28-1 at 12. And although Elbeblawy complains that this provision, too, was ambiguous — because "[a] guilty plea that has not yet been entered cannot be withdrawn" (Br. 31) — such semantic nitpicking falls short of rendering the agreement objectively unclear. Indeed, had the agreement been redrafted to refer to an attempt to "withdraw *or forgo* the plea *or contemplated plea*," as Elbeblawy suggests it should have been, this would have furthered the "profusion of legal jargon" that Elbeblawy elsewhere complains about (Br. 29). In any event, Elbeblawy plainly breached the provision of his plea agreement in which he "agree[d] to plead guilty." Doc. 28-1 at 1.

Nor is there any merit to Elbeblawy's similar complaint of ambiguity (Br. 32) because "the attached Agreed Factual Basis for Guilty Plea" had not yet been executed on the day he signed the plea agreement. Elbeblawy may not have signed the "Factual Basis" until days later, but the document was sufficiently identified in the plea

agreement.   *See* Restatement (Second) Contracts § 132(d) ("Reference to future writings").  And Elbeblawy's lawyer testified that, on the day Elbebelawy signed the plea agreement, "we had a . . . Factual Basis," although he could not recall whether the document was physically "stapled to" the plea agreement at the time.  Doc. 176 at 111-112.  Furthermore, not only was the "Factual Basis" understood by both parties at the time to be an attachment to the final plea agreement, it actually was attached to the final plea agreement — by Elbeblawy's lawyer — when he filed both documents with the district court, bundling them together as a single electronic attachment to Elbeblawy's motion to suppress.  *See* Doc. 28-1.  In any event, the plea agreement's reference to the subsequently signed "Factual Basis" was only illustrative of the evidence the government could introduce against Elbeblawy: the Rule 410 waiver generally covered any "statements[] and materials provided by [Elbeblawy] pursuant to this Agreement" that would otherwise be protected.  Elbeblawy does not appear to argue that this clause was ambiguous.  *See* Br. 29-32.[10]

In sum, applying the "general principles of contract law" that govern plea agreements, *Salmona*, 810 F.3d at 812, Elbeblawy entered into a valid "evidentiary

---

[10] Elbeblawy additionally argues (Br. 32) that the plea agreement was ambiguous because it defined "fail[ing] to tender such Agreement to the Court" as a breach of the agreement.  Doc. 28-1 at 12.  But this provision is immaterial: the government has never advanced any argument based on it.

stipulation[]" to allow the introduction of evidence that would otherwise be excluded under Rule 410.  *Mezzanatto*, 513 U.S. at 203; *Green*, 842 F.3d at 1315 n.10.

## B. The District Court Committed No Clear Error in Finding That Elbeblawy Knowingly and Voluntarily Waived His Right to Exclude His Written Confession

Elbeblawy's challenge to the introduction of his written confession also fails as a matter of fact, even accepting his incorrect legal premise that he was required to be personally and subjectively "[]aware of the nature of the right he abandoned."  Br. 26.

Elbeblawy cannot challenge the district court's legal conclusions, since the court accepted all of his legal arguments.  In its oral decision (Doc. 177 at 89-94), the district court adopted Elbeblawy's reading of *Mezzanatto* "[i]n an abundance of caution."  *Id.* at 89-90.[11]  Elbeblawy instead attacks the court's factual findings.  *See* Br. 25-26.  The district court found — after a two-day evidentiary hearing that featured testimony from both Elbeblawy and his pretrial counsel — that "[t]he record demonstrates that Mr. Elbeblawy waived the protections of Rule 410 knowingly and voluntarily," disbelieving Elbeblawy's "statement that he did not understand certain terms in the agreement."  Doc. 177 at 91, 93.  The district court committed no clear error when it weighed Elbeblawy's testimony against that of his former lawyer and found Elbeblawy's wanting.

---

[11] To the extent that Elbeblawy's attack on the waiver provision as "profoundly confusing" (Br. 25; *see also id.* at 29) could be read as a legal argument that the provision is objectively ambiguous as a matter of contract law, *cf. Escobedo*, 757 F.3d 229, that argument fails for the reasons described above.

Elbeblawy's pretrial counsel testified that he "literally read" the plea agreement to Elbeblawy "in my office," and that he pulled out a copy of the Sentencing Guidelines because Elbeblawy "was somewhat inquisitive." Doc. 176 at 85-86. He met with Elbeblawy at least two times and "walk[ed] through each paragraph separately," and he recalled that Elbeblawy "was very involved in . . . his case." *Id.* at 87. In particular, Elbeblawy focused on the significance of "the loss amount" and how "much time" it "exposed [him] to." *Id.* at 87; *see also id.* at 86 ("[W]e met several times because he wasn't too — it wasn't exactly what he expected. So we met several times. . . . He would bring the Plea Agreement. . . . He had a lot of questions about the loss amount."); *see also* Doc. 142 (6Tr.) at 90-91 (Elbeblawy's testimony, correctly recalling the top of his Guidelines range, 11 years, assuming a criminal history category I). Elbeblawy's pretrial counsel also testified that he always "go[es] over" a plea agreement's waiver paragraph with his clients and that he "d[id] that specifically with Mr. Elbeblawy." Doc. 176 at 88; *see also id.* at 89 ("Q. So you read this paragraph out loud to the Defendant? / A. If you ask me if I remember that exact moment, no. Do I always read them? Yes."). He concluded based on his interactions with his client that Elbeblawy understood what he was signing: "Q. Were you present when Mr. Elbeblawy signed this? / A. Yes. / Q. Is there any doubt in your mind that he signed this knowing[ly] and voluntarily? / A. No." *Id.* at 90; *see also* Doc. 177 at 8 ("Q. Other than those questions or concerns that he raised during those multiple meetings, did the Defendant indicate to you that there was

- 28 -

any portion of the Plea Agreement or Factual Basis that he didn't understand? / A. No.").

Elbeblawy's version of events was at odds with his pretrial counsel's testimony in a number of respects. When asked about the plea agreement, Elbeblawy admitted that his pretrial counsel "did read it, yes." Doc. 177 at 19. But when asked about their first meeting after receiving the proposed plea agreement — if they "primarily at that meeting discuss[ed] the guidelines" — Elbeblawy replied, "Not that I remember, no," and he denied that they ever "consider[ed] the amount of loss." *Id.* at 19-20. *But see* 6Tr. 90-91 (Elbeblawy's correctly recalling the top of his Guidelines range months later); Br. 27 ("their discussions centered around the calculation of Elbeblawy's sentencing guidelines range"). Elbeblawy also denied ever seeing the "Factual Proffer" before signing the plea agreement, testifying that "the first time [he] saw" it was more than a week after he signed the agreement. Doc. 177 at 23. *But see* Doc. 176 at 111-112 (pretrial counsel's testimony) ("That day," the day Elbeblawy signed the plea agreement, "we had a . . . Factual Basis."). Finally, although Elbeblawy never expressly testified that he did not understand the key provision at issue ("the Government will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him pursuant to this Agreement"), he did testify that his pretrial counsel did not "tell [him] what that meant." Doc. 177 at 23.

- 29 -

After hearing all of this testimony, the district court credited Elbeblawy's pretrial counsel instead of Elbeblawy. That was its prerogative. *See Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999). In particular, the district court stated that it "does not find credible [Elbeblawy's] statement that he did not understand certain terms in the agreement," and that it "does not believe [that] the Defendant's testimony that he was nervous about the whole thing discounts" his understanding of "the document . . . that he signed." Doc. 177 at 91. The court also observed more generally that Elbeblawy "cooperated" with the government "with eyes wide open," and that he had voluntarily "g[iven] statements regarding his past involvement in criminal activity." *Id.* at 93. In sum, the court concluded, "Mr. Elbeblawy waived the protections of Rule 410 knowingly and voluntarily." *Id.*

The district court's factual finding was not clearly erroneous. A factual finding cannot be clearly erroneous if it is "plausible in light of the record viewed in its entirety," *United States v. Siegelman*, 786 F.3d 1322, 1333 (11th Cir. 2015), and "the district court's choice between permissible views cannot be clear error," *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir. 2006). The court's credibility determination in this case is subject to an event greater degree of deference, because the court here "personally observe[d] the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). The "trial judge's choice of whom to believe" in this case does not "credit[] *exceedingly* improbable testimony." *Id.* (emphasis in original). To the contrary, the record

- 30 -

before the court supported — and the record subsequently developed more than bore

out — that Elbeblawy was at best an unreliable witness who would rarely miss an

opportunity to blame anyone other than himself.[12]  The district court properly chose

not to credit Elbeblawy's testimony, and certainly committed no clear error.

## C. Any Error in the Admission of the Elbeblawy's Written Confession Was Harmless

This Court has explained that "[e]videntiary decisions do not constitute

reversible error 'unless a substantial right of the party is affected,'" and that "errors that

do not 'affect substantial rights must be disregarded.'"  *United States v. Frazier*, 387 F.3d

---

[12] *See, e.g.*, Doc. 177 at 19 (Elbeblawy's testimony that his pretrial counsel never discussed the Guidelines range or loss amount with him, which is contradicted by both his pretrial counsel's testimony and Elbeblawy's brief on appeal, *see* Br. 27); *id.* at 40-43 (Elbeblawy's testimony that Gov't Exh. 7 was not a list of doctors whom Elbeblawy had admitted paying kickbacks to but instead was a list that the government had given him and then told him to mark in certain places, contrary to both the testimony of the special agents and to common sense, *see id.* at 63-64; *see also* 3Tr. 74; 4Tr. 127).  *See also* 4Tr. 147-148 (Elbeblawy's denial at trial that he had received exhibits when, according to the district court, the exhibits "ha[d] been made available to the Defendant for quite some time"); *id.* at 154-155 (denying that his trial counsel ever provided documents to him, and claiming that trial boxes were "empty files" until contradicted by the district court, who had personally seen Elbeblawy reviewing "documents, not empty files" for "30 minutes" while court was out of session); 5Tr. 8 (denying that "exhibits were made available . . . last night" when they were, *see* 4Tr. 314); 6Tr. 60-61, 89 (accusing his pretrial counsel of being too "friendly" with the prosecution); 6Tr. 107 (answering the question, "Can we agree that it's wrong to lie?," with "I'm not responding to your question.  You're not going to manipulate me anymore, none of you."); *id.* at 106 (accusing the district court of "playing with the law, so the juror[s] could be just distracted, not getting the idea"); *id.* at 56 (again claiming that government agents told him which names to mark on the list of doctors); *id.* at 197 (claiming that he "was completely framed").

1244, 1266 n. 20 (11th Cir. 2004) (quoting Fed. R. Evid. 103(a) and Fed. R. Crim. P. 52(a), and also citing the federal harmless-error statute, 28 U.S.C. § 2111). Evidentiary errors do not "affect a substantial right of a party" unless "they have a substantial influence on the outcome of a case or leave grave doubt as to whether they affected the outcome of a case." *Frazier*, 387 F.3d at 1266 n. 20 (internal quotation marks omitted); *see also* Br. 35.

Even if Elbeblawy's written confession had been erroneously admitted, there would be no "grave doubt" as to the outcome of this case. As the district court noted in ruling on Elbeblawy's post-trial motions, "the evidence in this case was overwhelming." Doc. 158 at 73. And even if "the most important piece of all of the evidence is the Defendant's own words about how he committed [his] fraud" (Br. 33 (quoting the prosecution's closing argument, *see* Doc. 142 (6Tr.) at 283)), that evidence is far broader than the written confession contained in the "Factual Basis" attached to Elbeblawy's plea agreement. In his closing argument, after making this statement, the prosecution detailed — over the course of four transcript pages — all of the admissions Elbeblawy made that were *not* part of his plea discussions. *See* 6Tr. 283-287 (discussing Elbeblawy's confessions to government agents, his admissions to paying specific doctors, his creation of a list of doctors (Gov't Exh. 6), his marking names on the list of Medicare doctors (Gov't Exh. 7), his admission to paying kickbacks to patient recruiters, and, most important, his discussions on video talking "to some of the same doctors about the illegal kickbacks that he used to pay them").

Much of this evidence was "more powerful" than the Factual Basis (Br. 36), and the videos were especially damning. Elbeblawy's defense, after all, was that he was framed. Had the jury believe him, a piece of paper drafted by the government with his signature on it would hardly have made any difference — it would have been consistent with his theory, not contrary to it. But the videos were a different matter. Elbeblawy's only response to them was to admit that the doctors on the videos were, in fact, accepting kickbacks from him; the best he could manage in response was that "it was kind of surprising for me" when they accepted his kickbacks. 6Tr. 71. As the government argued in closing, there is no innocent explanation for this evidence. *See also id.* at 286 (closing argument); *cf. id.* at 329 (rebuttal closing) (responding to Elbeblawy's "framed" argument by pointing to Elbeblawy's lists of doctors, Gov't Exhs. 6 and 7, not the "Factual Basis").

In light of the overwhelming evidence against Elbeblawy, including his own videotaped conversations, any error in allowing Elbeblawy to waive Rule 410 with respect to the "Factual Basis" would have been harmless.

## II.    There Was No *Brady* Violation

Elbeblawy briefly argues (Br. 37-39) that the government violated his due process right under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to turn over an interview

report in which Kansky Delisma — one of the doctors Elbeblawy paid kickbacks to[13] — initially denied dealing with Elbeblawy when first confronted by federal agents. There was no *Brady* violation. The government, as explained below,[14] inadvertently failed to produce one of seven interview reports for Delisma (out of a total of 130 interview and investigative reports), but this initial Delisma report was immaterial. The district court, having "sat through the trial," correctly concluded that producing the report would have made no difference to the outcome of the case. Doc. 158 at 71 (oral decision).

The constitutional rule announced in *Brady*, and extended by *Giglio v. United States*, 405 U.S. 150, 154 (1972), requires the production of exculpatory or impeaching information that is "material" to the defense. *See Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). Materiality, in this context, is a much higher standard than relevance. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). There is no due process violation under *Brady* "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," *id.* at 281, or "put the whole case in such a different light so as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the

---

[13] *See generally* Doc. 138 (3Tr.) at 138-237 (Delisma's trial testimony).

[14] *See* Doc. 116 at 18-19 (written pleading); Doc. 158 at 5-12 (transcript).

trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109 (1976).

The undisclosed interview report memorialized Delisma's initial denial — not only of wrongdoing, but of even dealing with Elbeblawy in the past few years — when federal agents first interviewed him, on June 3, 2015. When shown a picture of Elbebawy, Delisma first "stated that he did not know him," and then "advised that he may have seen Elbeblawy at [University of Miami] Hospital approximately 4-5 years ago," when Elbeblawy was approaching *other* doctors about his home-health agency. Doc. 107 at 4. Delisma told the agents that he "ha[d] not seen Elbeblawy since and . . . was never approached by Elbeblawy to discuss referring patients." *Id.*

That was a lie, and an obvious one. The second time they met with him, on June 17, 2015, the agents showed Delisma their videorecording of him and Elbeblawy talking about referring patients for money. *See* Doc. 158 at 11 (proffer); *see also* Doc. 139 (3Tr.) at 140 ("[Q.] How did you find out that the Government knew that you had referred patients to Mr. Elbeblawy in exchange for money? / A. I find out through the Government agent, who showed me a video where I was receiving cash money from Mr. Elbeblawy in exchange for a referral."). The video had been made a year earlier, in 2014, while Elbeblawy was cooperating with the government. *Id.* at 165-166; Gov't Exhs. 5A, 5B, 5C. So wholly aside from whether Delisma and Elbeblawy were discussing present or past crimes on the video, the very fact that they had met a year earlier and talked about referring patients belied Delisma's claim that he had not seen

- 35 -

Elbeblawy in the past four or five years and had never talked to him about referring patients.

Given the video of their recent meeting, there was no exculpatory value at all in Delisma's initial denials of recently meeting Elbeblawy. The denials were demonstrably false. And although, for that reason, the denials might have some "minimal impeachment value," *United States v. Jones*, 601 F.3d 1247, 1267 (11th Cir. 2010), they fall far short of the type of impeachment evidence that could change the outcome of this case. Delisma was the government's least important eyewitness: Escalona was the main cooperator, and both of the special agents were witnesses to Elbeblawy's many confessions over the course of his two-year cooperation. But Delisma, though he added some texture to the story, said nothing of importance that the jury had not already heard from Escalona.[15] And Delisma's honesty was already questionable. Not only did he confess to defrauding Medicare, but he was effectively cross-examined about his involvement in a *separate* Medicare fraud scheme involving his brother and confronted with his false statements to federal agents about that scheme. *See* Doc. 139 (3Tr.) at 203-206. Delisma had told agents that he was an innocent participant in the scheme

---

[15] Delisma's testimony is cited three times in the statement of facts above, once for his statement that Elbeblawy told him physical therapy is "where the money is," another time for his recollection that he would meet Elbeblawy in a parking lot and receive cash for signing patient forms without reading them, and a third time for the videorecording of his conversation with Elbeblawy (although the video could have been introduced through an agent's testimony). *See* Doc. 139 (3Tr.) at 149, 151, 166-173.

with his brother and had stopped once he learned that Medicare kickbacks were illegal. But as defense counsel put it, "[T]his was a lie. You knew from the day you applied to Medicare in 2008 that you couldn't take kickbacks." *Id.* at 205. And it was a lie to federal law-enforcement agents, just like Delisma's initial denials of any recent dealings with Elbeblawy. *See also* Doc. 158 at 91 (oral decision) (referring to the report of the second interview, discussed by government counsel earlier in the hearing, *see id.* at 11, in which federal agents accused Delisma of lying to them). Evidence "merely bolster[ing]" arguments already made is not material. *United States v. Hernandez*, 864 F.3d 1292, 1307 (11th Cir. 2017).

In sum, Delisma's initial denials lack any exculpatory value because they are demonstrably false, and they have only minimal impeachment value, because the jury already knew that Delisma was a liar who confessed to federal agents only once he was caught on video. Doc. 139 (3Tr.) at 140. In any event, Delisma was a relatively minor witness in a trial where the evidence of the defendant's guilt was overwhelming. *See Moon v. Head*, 285 F.3d 1301, 1313 (11th Cir. 2002); *see also* Doc. 158 at 73 (district court ruling) ("the evidence in this case was overwhelming"). There was no *Brady* violation.

## III.    There Was No Constructive Amendment of Count 2

Elbeblawy next contends (Br. 40-43) that the district court constructively amended the indictment because its instructions to the jury "broaden[ed] the bases" upon which he could be found guilty of the defraud-clause object charged in Count 2. Specifically, Elbeblawy argues that the indictment charged him (on this one prong of

Count 2) with deceptively interfering the government's lawful functions, while the district court instructed the jury that it could convict him for *either* cheating the government out of money or property *or* deceptively interfering with its lawful functions.

Elbeblawy failed to make this argument below: he made no objection to the district court's jury instruction that he now claims broadened the scope of the indictment (Doc. 142 (6Tr.) at 273-274; *see also id.* at 253-255), and he raised no "constructive amendment" argument until his reply in support of his post-trial motion attacking his convictions (*see* Doc. 121 at 4). His constructive-amendment claim may therefore be reviewed only for plain error. *See United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).[16] And his claim fails, both because there was no error (and certainly no clear or obvious error) and because any error was necessarily harmless in light of the jury's special-verdict form.

1. There was no error. Elbeblawy appears to misunderstand the Supreme Court's precedents interpreting the "defraud clause" of the conspiracy statute. *See* 18 U.S.C. § 371 (prohibiting conspiracies "to defraud the United States, or any agency

---

[16] "We may reverse a conviction under plain-error review if we find that four prongs are met: there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, we may exercise discretion to correct the error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Madden*, 733 F.3d at 1322.

thereof"). The district court's instruction was correct, and it did not broaden the charges in the indictment.

Count 2 of the indictment alleged a dual-object conspiracy to (1) pay kickbacks for referring Medicare patients, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), and (2) defraud the United States, in violation of the "defraud clause" of 18 U.S.C. § 371. Doc. 59 at 9-10 (superseding indictment). With respect to the "defraud clause" object, the indictment charged Elbeblawy with conspiring "to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program." *Id.* The district court later instructed the jury (following this Court's pattern instructions) that "[t]o defraud the United States means to cheat the Government out of the property [sic] or money or to interfere with any of its lawful Government functions by deceit, craft, or trickery." Doc. 142 (6Tr.) at 273-274; *see also* Doc. 85 at 12 (written instructions); *compare* Eleventh Circuit Pattern Jury Instructions (Criminal Cases) O13.6 (2016).

Elbeblawy argues (Br. 41) that because the indictment charged only the latter clause ("interfering"), while the jury instructions charged both ("cheating" and "interfering"), the instructions broadened the possible bases of conviction. Elbeblawy's argument implies that "cheating the government out of property or money" is a separate and distinct criminal object from "interfer[ing] with any of its lawful

[g]overnment[al] functions by deceit, craft, or trickery." Br. 41. That is wrong: cheating the government out of money or property is a *type* of deceptive interference with the government's lawful functions.

The Supreme Court has long construed the "defraud clause" of § 371 as prohibiting conspiracies *not only* to deprive the government of "property or money" *but also* to obstruct or impair the lawful functions of the government "by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979) (quoting *Hammerschmidt*). Dishonesty is the key limiting element, not financial harm: "it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result." *Haas v. Henckel*, 216 U.S. 462, 479 (1910); *see also Hammerschmidt*, 265 U.S. at 187 (contemplated fraud need not "have inflicted upon the government a pecuniary loss" as long as "its purpose and effect [was] to defeat a lawful function of the government and injure others thereby"). This broad understanding of the defraud clause — broader than traditional money-or-property fraud — has been reaffirmed numerous times by the Supreme Court over the past century. *See, e.g.*, *Dennis v. United States*, 384 U.S. 855, 861 (1966) ("th[e] statutory language is not confined to fraud as that term has been defined in the common law"). And the Court's defraud-clause precedent makes clear what common-sense would suggest: that tricking the government into paying out money, when those payments should not be made, is a type of deceptive interference with the government's lawful functions (which include paying money).

The district court therefore did not broaden the bases for conviction when it instructed the jury. Elbeblawy was charged — and the jury was instructed — under *Hammerschmidt*'s broad definition of the defraud clause. Correctly specifying that cheating the government out of money or property (as occurred in this case) falls within *Hammerschmidt*'s definition could not have "broadened the possible bases for conviction beyond what was specified in the superseding indictment." *Madden*, 733 F.3d at 1318.

2. At the very least, Elbeblawy provides no authority (or, really, any developed argument at all) for his assumption that cheating is not a type of interfering. Thus any error that might have occurred could not have been clear or obvious. *See United States v. Pielago*, 135 F.3d 703, 711 (11th Cir. 1998) ("Court[s] of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.").

3. Moreover, the record makes clear that any error in the defraud-clause instruction on Count 2 was harmless. The jury's special-verdict form (Doc. 90 at 2) shows that Elbeblawy's conviction on Count 2 was supported by the healthcare-kickback object, as well, whose validity is not in dispute. *See Skilling v. United States*, 561 U.S. 358, 414 (2010). *A fortiorari*, Elbeblawy cannot meet his burden of showing prejudice under the third prong of plain-error review.[17]

---

[17] Elbeblawy invokes "the cumulative error doctrine" as a separate section in his brief (Br. 44-45), but that doctrine has no application here. It turns on the "interrelationship" and "combined effect" of multiple errors that might not be reversible taken alone. *United States v. Jeri*, — F.3d —, 2017 WL 3866412, at *14 (11th Cir. Sept. 5, 2017). But any *Brady* error would necessarily require a new trial. *See Strickler*,

## IV.    The District Court Correctly Calculated Elbeblawy's Guidelines Range

Elbeblawy attacks (Br. 46-48) his sentence of imprisonment on three grounds, each of which can be briefly disposed of.

1.    Elbeblawy (Br. 46) claims that the district court violated the Constitution's *Ex Post Facto* Clause by sentencing him based on the more severe version of the Sentencing Guidelines in effect at his sentencing (the November 2015 Guidelines) instead of the less severe version in effect before November 1, 2011.  *See* U.S.S.G. App. C, vol. III, at 388-89 (amend. 749) (adding a four-level increase for federal health-care offenses involving more than $20 million); *see also Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013) (holding that the *Ex Post Facto* clause applies even to the advisory Guidelines); *United States v. Wetherald*, 636 F.3d 1315, 1322 (11th Cir. 2011) (same).  But there can be no *ex post facto* concern if Elbeblawy's criminal conduct continued past November 1, 2011.  *See United States v. Aviles*, 518 F.3d 1228, 1230 (11th Cir. 2008).  And the district court found that it did.  *See* Doc. 179 at 97 ("this conspiracy was a continuing criminal conduct that began in 2006 and ended in 2013").

The district court's factual finding that Elbeblawy's offense conduct continued past November 2011 was not clearly erroneous.  Elbewblawy did not flee to Egypt until May 2012.  *See* Doc. 140 (2Tr.) at 210.   And according to Elbeblawy's written

---

527 U.S. at 281 ("there is never a real '*Brady violation*'" without prejudice).  And the jury's special-verdict form renders the constructive-amendment issue harmless.

confession, his offense conduct continued into 2013.  *See* Gov't Exh. 1.  As explained above, that confession was properly admitted at trial under Rule 410; but even if it had not been, the rules of evidence do not apply to sentencing proceedings.  *See Green*, 842 F.3d at 1319 n.12 (citing Fed. R. Evid. 1101(d)); *see also* U.S.S.G. § 6A1.3(a).

2.    Elbeblawy also claims (Br. 48) that his criminal conduct was not "sophisticated" and that he therefore did not qualify for the two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C).  The district court found that his conduct constituted sophisticated means (Doc. 179 at 82-83) and committed no clear error in so finding. *See United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009) ("We review the district court's findings of fact related to the imposition of sentencing enhancements, including a finding that the defendant used sophisticated means, for clear error.").

The Guidelines' commentary defines the term "sophisticated means" as referring to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," such as "the use of fictitious entities, corporate shells, or offshore financial accounts."  U.S.S.G. § 2T1.1 comment. n.9(B). "Sophistication" in this context refers "not to the elegance, the 'class,' the 'style' of the defrauder — the degree to which he approximates Cary Grant — but to the presence of efforts at concealment that go beyond . . . the concealment inherent" in the crimes of conviction.  *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) (discussing "sophisticated means" in the context of tax fraud).  Accordingly, this Court has held that "concealing . . . transactions through the use of third-party accounts," as well as

concealing transaction through completely fictitious or sham entities, can constitute "sophisticated means." *Clarke*, 562 F.3d at 1166.

Concealing kickback payments by creating fake contracts and fake business relationships, and disguising payments as part of an otherwise legitimate business relationship, fit comfortably within the Guidelines' definition of sophistication. *See* Doc. 138 (2Tr.) at 54-65 (describing Elbeblawy's scheme to conceal his kickback payments). As the district court found, this was "an elaborate scheme" "involving fraudulent contracts" with third parties. Doc. 179 at 99-100; *see also id.* at 83 (government's argument that "the Defendant devised a scheme where the recruiters were hired as employees, but their salary was only based on how many patients they brought in. . . . [t]his was a very detailed scheme to completely hide the nature of these payments"). Elbeblawy "created sham contracts with the groups" that "were specifically designed to hide the amount of kickbacks in the rates that were paid for services." *Id.*; *see also id.* at 89 (defense counsel's concession that Elbeblawy used sham business arrangements, using the word "sham" four times). Defense counsel argued that these "sham" transactions were themselves unsophisticated, but that is not the test. The question is whether using fictitious entities or business arrangements goes beyond the concealment inherent in the underlying criminal fraud, and the answer is yes — indeed, Elbeblawy's sham contracts were enough to allow his fraud to fly under the radar for years. Moreover, Elbeblawy's use of his wife as a nominee to open a new home-health agency (Healthy Choice) is yet another basis that would support the

- 44 -

enhancement. *See, e.g.*, *United States v. Paul*, 518 Fed. App'x 894, 898 (11th Cir. 2013) (enhancement supported by defendant's use of his wife's business to commit fraud, *citing United States v. Campbell*, 491 F.3d 1306, 1315-16 (11th Cir. 2007)). Given the evidence, the district court committed no clear error in imposing the enhancement.

3. Elbeblawy also challenges (Br. 47) the district court's fraud-loss amount under U.S.S.G. § 2B1.1(b)(1), complaining that the district court's finding (Doc. 179 at 98) of a loss in excess of $25 million "was premised on unknown theories of either kickbacks or unnecessary services or unqualified medical speculation by Escalona." But the district court made a "reasonable estimate" of the loss, which is all the Guidelines require. U.S.S.G. § 2B1.1, cmt. n.3(C); *see also United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999) (noting that "often the amount of loss caused by fraud is difficult to determine" with precision). And Elbeblawy does not dispute that the government need only establish the loss amount by a preponderance of the evidence, *see United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015), or that Elbeblawy is liable (under the Guidelines) for the loss caused by both him and Escalona, *see* U.S.S.G. § 1B1.3(a)(1)(B), (a)(2); *Siegelman*, 786 F.3d at 1332-33.

Escalona estimated that about 90% of the patients at Willsand and JEM were illegally referred in exchange for kickbacks. Doc. 138 (2Tr.) at 106-107; *cf.* Doc. 139 (3Tr.) at 27-31 (Medicare audit findings of 73% and 99% overpayment rates). Willsand and JEM collectively reaped about $38 million in Medicare payments ($29.1 million and $8.7 million, respectively). Doc. 140 (4Tr.) at 63, 65; Gov't Exhs. 1000 & 1001; *see also*

- 45 -

4Tr. 67 (additional $2.5 million from Healthy Choice).  Ninety percent of the total from

all three entities — $40,445,507 — is $36,400,957, the number the district court used

as the basis for its forfeiture order.  Doc. 179 at 58.[18]  But even omitting Healthy Choice

— or, for that matter, omitting Healthy Choice and applying the lower 73%

overpayment rate to $37.8 million, or even just using the $27 million figure to which

Elbeblawy confessed (Gov't Exh. 1 at 2) — the total fraud loss in all events is more

than $25 million, as the district court found.  Doc. 179 at 98.  There was no clear error.

## V.    The District Court's Forfeiture Order Should Be Vacated and the Case Remanded for Entry of a Forfeiture Order Consistent with *Honeycutt*

Elbeblawy challenges (Br. 49-54) his forfeiture order on three grounds.  *See*

Doc. 179 at 57-58 (oral decision on forfeiture).  Only the last ground has any merit.

Elbeblawy's first two grounds can be quickly disposed of.  He argues that there

is "no authority for" an *in personam* "forfeiture money judgment" (Br. 49-50), but that

argument is foreclosed by this Court's precedents.  *See United States v. Padron*, 527 F.3d

1156, 1162 (11th Cir. 2008) (district court did not "exceed [its] statutory authority"

because the forfeiture statutes and Federal Rules of Criminal Procedure "contemplate

---

[18] Elbeblawy makes no evidentiary challenge to the district court's forfeiture order, instead attacking it as unlawful (Br. 49-54).  But we note that the forfeiture figure is supported by a preponderance of the evidence, including Escalona's 90% estimate for Willsand and JEM, as well as the evidence that Elbeblawy's scheme continued after JEM got shut down and he used his wife to open Healthy Choice.  *See, e.g.*, Doc. 139 at 78-79, 86, 93 (doctors whose videorecordings were played at trial referred patients to both JEM and Healthy Choice); Gov't Exh. 1.

the entry of money judgments in criminal forfeiture cases"); *United States v. Hernandez*, 803 F.3d 1341, 1344 (11th Cir. 2015) ("forfeiture in criminal proceedings" is "*in personam*"). Also foreclosed by precedent is Elbeblawy's argument (Br. 51) that the Sixth Amendment required the jury to determine the amount of forfeiture. *See United States v. Curbelo*, 726 F.3d 1260, 1278 n.10 (11th Cir. 2013) ("the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection" (quoting *Libretti v. United States*, 516 U.S. 29, 49 (1995)). Although Elbeblawy acknowledges this precedent (Br. 52), he incorrectly contends that it has been superseded by the Supreme Court's application of the *Apprendi* doctrine to mandatory minimum sentences in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). But *Curbelo* was not, as Elbeblawy states (Br. 52), "a pre-*Alleyne* decision" that could have been superseded by *Alleyne* — *Curbelo* was decided in August 2013, two months after *Alleyne*. In any event, it would be the Supreme Court's "prerogative" to overrule *Libretti*, not this Court's. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

Elbeblawy's final argument is that the district court imposed "[i]mproper joint and several liability" (Br. 53) under *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), a decision issued after his sentencing. *Honeycutt* held that a defendant may not "be held jointly and severally liable" for illegal-drug proceeds that the defendant "had no ownership interest in" and "did not personally benefit from." *Id.* at 1630, 1635. Although the Court's reasoning was primarily based on the wording of the drug-forfeiture provision, § 853(a), and here forfeiture was ordered under 18 U.S.C.

- 47 -

§ 982(a)(7) (healthcare fraud), *Honeycutt* also stated that § 853(p) — the substitute-assets provision that § 982 incorporates by reference — "lays to rest any doubt that the statute permits joint and several liability."  137 S. Ct. at 1633.  Applying *Honeycutt*, Elbeblawy should not have been held jointly and severally liable for the gross proceeds of Willsand during the time he was a mere employee at the company with no legal or *de facto* ownership interest in its proceeds — although he is still liable for the benefits he personally received from those proceeds (*e.g.*, his salary, sports cars, and dinner expenses, *see* Doc. 138 (2Tr.) at 82; Doc. 140 (4Tr.) at 130-131).  *Honeycutt* does not affect the forfeiture from JEM and Healthy Choice: Elbeblawy was an owner of both (*see, e.g.*, Gov't Exh. 1) and therefore correctly required to forfeit the "gross proceeds" (not profits, *contra* Br. 54) from both entities "traceable to the commission of the offense," § 982(a)(7).  Elbeblawy is correct, however, that *Honeycutt* requires a limited remand for the entry of a new forfeiture order.[19]

---

[19] In the post-*Honeycutt* case that Elbeblawy relies on (Br. 54 n.5) for his vacate-and-remand argument, the court of appeals held that remand should be "for the sole purpose of determining the appropriate forfeiture amount."  *Brown v. United States*, — Fed. App'x —, 2017 WL 3404979, *2 (3d Cir. 2017); *see also United States v. Pickel*, 863 F.3d 1240, 1260-61 (10th Cir. 2017).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed except with respect to the forfeiture order, which should be vacated. The case should be remanded to the district court for the sole purpose of determining the appropriate forfeiture amount.

Respectfully submitted,

BENJAMIN G. GREENBERG
Acting United States Attorney
Southern District of Florida

NALINA SOMBUNTHAM
Assistant United States Attorney
Southern District of Florida

NICHOLAS E. SURMACZ
VASANTH R. SRIDHARAN
Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

KENNETH A. BLANCO
Acting Assistant Attorney General

TREVOR N. MCFADDEN
Deputy Assistant Attorney General

s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
TEL 202-514-3521/FAX 202-305-2121
Alexander.Robbins@usdoj.gov

DATED:    October 6, 2017

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,939 words (with a proportionately spaced typeface, Garamond, at 14 points, double-spaced in text and single-spaced in headings and footnotes). This certification is based on the word count of Microsoft Word 2013, the word-processing system used in preparing this brief.

s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
TEL 202-514-3521/FAX 202-305-2121
Alexander.Robbins@usdoj.gov

DATED:    October 6, 2017

## CERTIFICATE OF SERVICE

I certify that, on this date, I caused this brief to be served upon the Filing User identified below through the Court's Case Management / Electronic Case Files ("cm/ecf") system:

> Richard C. Klugh
> 25 S.E. 2nd Avenue, Suite 1100
> Miami, Florida 33131-1674
> 305-536-1191
> rickklu@aol.com

s/ Alexander P. Robbins
ALEXANDER P. ROBBINS
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW, Rm. 1264
Washington, DC 20530
TEL 202-514-3521/FAX 202-305-2121
Alexander.Robbins@usdoj.gov

DATED:    October 6, 2017